IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| BARBARA KHAN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CV-03-PT-2971-E |
| | ) | |
| v. | ) | |
| | ) | |
| REGIONS BANK, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF LAW

This cause comes on to be heard upon defendant Regions Bank's ("Regions") Motion for

Summary Judgment, filed on June 16, 2004.

## FACTS AND PROCEDURAL HISTORY[1]

### I.  Regions launches a staff adequacy review.

In late 2001 or early 2002, representatives of defendant's Mobile, Alabama bank made a

presentation to the presidents of other Regions banks in Alabama about a staff adequacy review that

they had conducted. (Wood Dep., 10).[2]  Officials of the Mobile bank had identified inefficiencies

in their operations, which were discussed in their presentation. (*Id.*, 12). Afterwards, Steve Wilkes,

who had been employed by Regions (and its predecessors) for thirty-seven years and was then

serving as the President of the Central Alabama Group, commissioned a staff adequacy review of

the branches in his group to determine whether those branches were operating efficiently. (Wilkes

---

[1] The court notes where facts appear disputed.

[2] Gary Wood ("Wood") is the Senior Vice President for Operations and Retail Lending for the Central
Alabama Group of Regions Bank.

Dep., 7-8; Wood Dep., 9).

Wilkes appointed a review committee that included representatives familiar with the various functions of the bank. (Wilkes Dep., 8). He charged them with reviewing branch staffing levels and determining whether efficiency could be improved through elimination of any job positions. (Wilkes Dep., 9-11; Wood Dep., 12). Wood served as the team leader of the review committee. (Wood Dep., 11). Wood is 53 years old and had been employed by Regions (and its predecessors) for twenty-five years. (*Id.*, 11).

## II.     The review committee develops a procedure for evaluating branch efficiency.

As an initial step in its evaluation process, the team developed a form on which employees could describe their duties. (Wood Dep., 7). The team distributed the form to the presidents of affiliate banks and requested that the bank presidents ask the associates in the branches in their areas to complete the forms. (Id.) All branch employees other than branch managers and tellers were asked to complete the job description forms and return them. (Wood Dep., 7, 39) Once the forms were returned to the committee, Wood reviewed them and then conducted interviews of branch personnel in an effort to get a better understanding of their daily duties. (Wood Dep., 17, 20, 27-28, 32). In those interviews, he asked the branch personnel to describe their daily duties and to "walk [him] through [their] day." (Wood Dep., 27, 33).

## III.    Barbara Khan describes her job duties.

Barbara Khan had worked for Regions Bank and its predecessors since February 1968. (Khan Dep., 28). When she completed the job description form, she was an Assistant Vice President and was Assistant Branch Manager of Regions's Talladega branch. (Khan Dep., 36-37.) She was classified as a bank officer. (Wood Declaration, ¶ 10.) Khan completed the job description form that

had been disseminated by the staff adequacy review committee. (Khan Dep., 38-40; Ex. 4). As she did so, she understood that the review committee "wanted to know what each person was doing so that they could perhaps adjust or realign the work load." (Khan Dep., 40). She listed all of her job functions on the form. (Id.)[3]

The first item Khan listed on her job description form was "Supervise 8 Tellers and 1 Vault Custodian, scheduling their work daily." (Khan Dep., Ex. 4). In her deposition, Khan explained, this task required her to ensure that all the necessary teller positions were covered during the day by occasionally moving employees from one work station to another, particularly on days when they were short of help. (Khan Dep., 41). She would make these changes at the beginning of each day, if necessary. (Id.)  As a part of the bank's "dual control" system, she would assist Janet Mitchell in opening the vault in the mornings. (Khan Dep., 44-45)  Mitchell, the vault custodian (sometimes referred to as the vault teller) was not a bank officer, as was Khan; she was Khan's assistant. (Khan Dep., 44-45, 160; Wood Decl., ¶ 10.) Once the vault was opened, several people would go in the vault to "work up" deposits that customers had dropped in the night deposit. (Khan Dep, 45-46). Khan would observe this process. (Khan Dep., 46-47)

The next item Khan listed on her job description form was: "See that these employees are properly trained." (Khan Dep., Ex. 4) In years past, Khan had trained new tellers by working with them at the teller counter. (Khan Dep., 54-55.) She had also helped them sign up for any further

---

[3] This court observes that the record contains two forms  - Exhibit 4 (discussed in detail below) and Exhibit 5.  Khan testified that she made the additional handwritten notations on Exhibit 5 after she submitted Exhibit 4.

The handwritten notations on Exhibit 5 are: (1) Job Title - changed from "Assistant Branch Manager, III" to "Assistant Branch Manager, I"; and (2) Monthly duties - changed from nothing underneath to "audit branches 1 day a month - go to Sylacauga and Lincoln." She performed the auditing task along with her supervisor, Linda Johnson. (Khan Depo., 66, 100.)

training that the bank was offering, if they were interested. (Khan Dep., 60-61.)

In more recent times, however, that training process changed. (Khan Dep., 55-56.)  Under

the new training system, Khan neither trained new tellers nor administered their follow-up career

training.[4]  In fact, Khan knows very little about the more recent training of tellers. (Khan Dep., 57.)

---

[4]  Khan did testify that she spent time with the new employees (sometimes one to two weeks) even after Regions implemented the new training system.  In this regard, she stated:

> Q: The training process for the tellers, did that change?
> A: Yes.  They – close to the end of the time that I was there, ...[t]hey would send the teller to the Anniston Bank, the main office.  And I'm not sure of the procedure, but it would be up there.
> Q: How long would the tellers spend up there in training?
> A: It seems like two or three weeks.
> Q: And then after that two- to three-week period, they would come back to the Talladega branch?
> A: Right.
> ...
> Q: And what would happen at that point?
> A: Then I would take them and I would spend time with them there to help them through the process.
> Q: How much time?
> A: According to the person.  Sometimes one or two weeks usually.
> Q: Do you recall how many new tellers that were trained under this system before you left Regions?
> A: Somewhere between maybe three to five....  I'm just not sure.
> ...
> Q: Under that [new] system, when the tellers came after their training in Anniston to the Talladega branch, were they assigned another teller that was a mentor or coach of some sort?
> A: Yes, I think I remember that.
> Q: What, if you know, did the training in Anniston consist of?
> A: I know very little about it.  I do recall that they – being a new person, I think they may have been handed a booklet and sent – put in a room with a computer.  And they just followed the instructions from the booklet.  And when they were – I guess they would finish a section and they'd, I guess, let someone know so they could evaluate them.
> ...
> Q: And so when they would come back or come to the Talladega branch after going through that, what was your purpose in spending time with them?  Why did

She knew that new tellers were sent to the Anniston bank to go through a two-to-three-week training program. (Id.)  Once they completed their training in Anniston, the new tellers were assigned another teller to serve as a mentor. (Khan Dep., 57).

Subsequent career training was provided to tellers through the Teller Career Program, through which tellers could get training on various areas of bank operations to allow them to advance in their careers. (Khan Dep., 51-52.) Darlo McRae, the Talladega branch's human resources representative, administered the Teller Career Program. (Khan Dep., 52.)  This new career development program was implemented shortly after the end of Khan's employment with Regions. (Id.)

The third item that Khan listed on her job description form was "Prepare their performance reviews." Khan completed a two-page annual review form for each of the tellers. (Khan Dep., 63; Khan Dep., Ex. 6) For new tellers, she also completed a review form on the teller's 90-day anniversary and 6-month anniversary. (Khan Dep., 64) There were 8 tellers on staff. (Khan Dep., 41). Turnover in tellers typically resulted in a new teller being hired once every three months or so. (Khan Dep., 55)

Fourth on her list, Khan described herself as the "Compliance person for the BSA." (Khan Dep., Ex. 4, p. 1). She also listed a duplicative entry on her job description form at the bottom of its second page: "Every 6 months prepare BSA training for each employee in main office and branches,

---

you spend time with the new tellers?
A: Our thinking – my thinking is that working with the computer and paper is not like working with people and money.
...
A: So I tried to spend time with them to make sure that they understood and introduced them to our good customers....

in order to be in compliance." (Khan Dep., Ex. 4, p. 2). "BSA" is an acronym for "Bank Secrecy Act." (Khan Dep, 68) In this role, Khan testified in her deposition that she conducted a meeting with the tellers, once every six months for five-fifteen minutes. (Khan Dep., 69-70, 140-41.) She would usually spend about an hour preparing for those meetings. (Khan Dep., 69)[5]

Khan's form also described her as "Branch Automation Supervisor." (Khan Dep., Ex. 4, p. 1) She also listed the related entry, "Resolve computer problems, restamps, etc." (Id.) On the second page of her job description form, among her quarterly duties, Khan listed "Perform Down Loads to computer." (Khan Dep., Ex. 4, p. 2.) In her deposition, Khan explained that this collection of duties included changing backup computer tapes and security camera videotapes on a regular basis. (Khan Dep., 71-72) Once a quarter, she and Janet Mitchell downloaded software updates from the Regions information technology system to the computer terminals in the Talladega office. (Khan Dep., 73.) "Resolv[ing] computer problems" involved telephoning the branch automation department for instructions to follow when someone in the branch had a computer problem. (Khan Dep., 96-97) In her deposition, Khan described a "restamp" as, essentially, reloading a computer's software. She testified: "The restamp, I understand, is if a computer is not performing correctly, then the information to make it - the software work is put back into the computer, the one that's having the problem." (Khan Dep., 97).

As "Chart the course member and coach for tellers" (Khan Dep., Ex. 4), Khan held a weekly fifteen-minute meeting with tellers to discuss ways that they could encourage customers to apply for other Regions products and services. (Khan Dep., 74-76).

The next duty that Khan listed after her Chart the Course entry was "Post teller outages,

_____

[5] By Khan's own estimation, defendant argues, this function occupied less than three hours per year.

number of proof errors, and transcount daily for main office and our branches." (Khan Dep., Ex. 4)
Khan was in the habit of maintaining manual records of any discrepancies between a teller's daily
balance and the computerized records of what the balance should be. (Khan Dep., 80.) She would
then determine whether the discrepancy was due to a teller's error or an error by the proof
department, a "proof error." (Khan Dep., 81.) The "transcount daily" represents the number of
transactions that a teller processed in a day. (Khan Dep., 82.) Khan testified that tracking this
information was computerized towards the end of her employment with Regions. (Khan Dep.,
83-84.) Nonetheless, she continued to make manual notations of those figures for use in her
performance evaluations of the tellers. (Id.)

The next item Khan listed on her job description form was "Research teller and customer
outages and errors." That function was "beginning to be" centralized towards the end of Khan's
tenure at Regions. (Khan Dep., 88.) Before that function was centralized, when an error was
discovered in a customer's account, Khan would talk with the proof department and attempt to
determine how the error had come about and what steps should be made to correct it. (Khan Dep.
87-88.)

Khan's next duty, as listed on her job description form, was "Account for official items daily,
verifying log sheet against the computer report." (Khan Dep., Ex. 4.) This task involved ensuring
that accurate records had been kept on the sale of official checks, travelers checks, certificates of
deposit, and money orders. (Khan Dep., 90.) This function was primarily performed by a teller.
(Khan Dep., 91.) Once the teller had completed this task, Khan would check the teller's work to be
sure it had been done correctly. (Khan Dep., 93.)

The next item Khan listed on her job description form was "wire funds for customers." (Khan

Dep., Ex. 4) Khan was one of several officers of the bank authorized to "wire" money to accounts in other banks. (Khan Dep., 94.)  She testified that she might be called on to process a wire transaction once a week or so. (Khan Dep., 94-95.)

Next, Khan listed "assign audio numbers as needed and keep the log on this." (Khan Dep., Ex. 4.)  "Audio numbers" are identification numbers assigned to new tellers so that they can sign onto the Regions computer network. (Khan Dep., 95.) She kept a log of these numbers. (Id.) This assignment took her only a minute or two to complete, when a new teller was hired. (Khan Dep., 96.)

In addition to performing down loads to computers, discussed above, Khan listed "Quarterly Procedural Controls" and "Quarterly Accountability Controls" among her quarterly duties.  These reports would be completed at the same time, once a quarter, and serve as verification by the local branch that they were conducting the required internal control procedures to ensure that cash, safety deposit boxes, official checks, etc., were being handled and accounted for properly in the daily course of business. (Khan Dep., 104-06). Once a year, Khan prepared an "Annual Addendum to the Quarterly Procedural Controls Assessment," which covered the same topics as the quarterly reports. (Khan Dep., 112; Khan Dep., Ex. 4, p. 2) Khan's subsequent entry "BICMS Control Person (Certifier)" on her job description form referred to the quarterly reporting process discussed above. (Khan Dep., 138-39; Khan Dep., Ex. 4, p.2).

The next entry Khan made on her job description form was: "I am the back up person for Janet Mitchell when she is not at work." (Khan Dep., Ex. 4) Whenever Mitchell was off, Khan would fill in for her. (Khan Dep., 117-18). The reverse was also true. When Khan was off work, Mitchell would fill in for her. (Khan Dep., 133).

8

Twice a year, Khan coordinated a team of Regions employees to provide services to the company that manages NASCAR races at the Talladega Superspeedway. (Khan Dep., 135-36). She noted this responsibility on her job description form: "Twice a year I coordinate and supervise the work teams for the Talladega Superspeedway and the Americrown company for the two races held in Talladega." (Khan Dep., Ex. 4)  There would be approximately fifteen employees who would work at the track, some managing cash and some selling tickets. (Khan Dep., 135-36.)

**IV.     Wood interviews Khan about her job duties.**

Wood interviewed Khan when Wood came to Talladega to interview employees there about their job duties. (Wood Dep., 27).  He had reviewed the job description form that she had completed. (*Id.*, 20.)  In the interview, he asked her to describe her duties and her daily routine. (Id.)

**V.     Wood concludes that Khan's duties do not support a full-time position.**

In his review of Khan's job description, Wood noted that several of the duties she had listed had been automated or centralized and should no longer have been performed in the local branch. (Wood Dep., 22) According to Wood, there was no need for Khan to continue making manual notations about teller outages, proof errors, and daily transcounts, for example. (Id.) Record-keeping concerning those items had been automated, and Regions's computer system produced a monthly report on those issues. (Wood Dep., 22-23) In addition, researching teller and customer outages had been centralized in Birmingham and no longer needed to be conducted at the local level. (Id.) Wood also noted that computer downloads were fully automated now, so Khan should not have been doing them any longer. (*Id.* at 23.)  With regard to teller training, Wood noted, tellers are trained outside of the branch and are then assigned a full-time teller – who would not have been Khan -- as a "coach." (Id.)

9

In addition to the tasks that Khan had listed that had been centralized or eliminated, Wood noted that the remainder of her duties would not have required a full-time employee to complete them. (Wood Dep., 25.)  Wood believed that many of the functions Khan listed on her job description form take "just a few minutes each day" to complete and that she would have had "quite a few hours a day [where] there would not be anything going on." (Wood Dep., 26)

## VI.   Wood recommends positions, including Khan's, for elimination.

Upon completion of the interviews, Wood made initial recommendations of the positions he believed should be eliminated. (Wood Dep., 50.) His recommendations included the elimination of Khan's position. (*Id. at* 36-37.)  By contrast, Woods stated, he did not recommend the elimination of Janet Mitchell's position because her job duties required a full-time position. (*Id.* at 25, 28-29, 36-37.)  As the vault custodian, Mitchell's duties managing cash flow to tellers and cash transfers in and out of the bank from Birmingham constituted a full time function. (*Id.* at 25.)  In that role, Wood asserted, Mitchell also had significant daily contact with customers. (Wood Decl., ¶ 10).  According to Wood, Mitchell also served as an immediate resource for the tellers, and her interaction with the tellers was akin to the role played by a "head teller." (*Id.*).

In addition to Khan's position, Wood also recommended eliminating the positions of the following employees: the custodian, because custodial services were being outsourced. (*Id.* at ¶6.); the telephone receptionist because the bank had implemented an automated telephone system that routed calls to a centralized call center, eliminating the need for an employee to serve as a telephone receptionist. (Wood Decl., ¶ 6; Khan Dep., 153); and a loan quality officer and staff assistant, because those positions also did not have sufficient work to support full-time positions. (Wood Decl., section 6.)

10

Wood sent his recommendations to Paul Lloyd and Scott Dondlinger, who were two other members of the review committee. (Id.)  Lloyd represented the Human Resources Department and Dondlinger represented the accounting department. (Wood Dep., 13).  The local bank presidents were consulted about the proposed position eliminations in their banks before the final decision to eliminate the positions that the committee members had recommended was made. (Wilkes Dep., 9; Wood Dep., 41).

In determining which positions to recommend for elimination, Wood stated that he considered the job duties and responsibilities of the individual employees to determine whether the duties the employees were responsible for justified a full-time position. (Wood Dep., 19, 21). For example, if an employee was performing duties that could be performed in "say 10, 15, 20 percent of the day, that would be [a] position that we'd look at eliminating." (Wood Dep., 29).  According to Wood, his decisions were based solely on his perceptions regarding the amount of work each employee was responsible for and whether that amount of work justified a full-time position. (Wood Dep., 37).

Wood did not review or consider the contents of the employee's personnel files, *see* Wood Dep. at pp. 21 & 37, compare or review the employees' job performance evaluations, consider whether employees had ever been "written up," or consider the employee's seniority with the company. (*Id.* at 37).  According to Wood, employees' ages were not listed on their job description forms, Wood did not ask their ages, and the employees did not volunteer their ages during their interviews. (Wood Dep., 52).  According to Wood, he neither considered the employees' ages in determining which positions to recommend for elimination nor performed an analysis of the ages of the employees who were in the positions that he recommended for elimination. (Wood Dep., 40).

11

On November 3, 2003, Khan filed a complaint alleging that Regions discriminated against her based on her age in violation of the Age Discrimination in Employment Act ("ADEA"). Specifically, the complaint alleged that plaintiff was sixty years old when her employment was terminated and was thus the oldest person employed at her branch except for the telephone receptionist who was also terminated. While plaintiff was told that her job was being eliminated and her job duties assigned to the Birmingham office, the complaint contends, "[o]nly a minor portion of her job duties were transferred ... [and] [t]he balance of her job duties continued to be performed in Talladega, [with] the majority of same ... assigned to plaintiff's former assistant who was substantially younger then (sic) plaintiff." Furthermore, the complaint alleges, plaintiff had received excellent evaluations, and her direct supervisor advised her that he did not understand why she was selected for lay off. According to the complaint, plaintiff "had more seniority, experience and knowledge than nearly all of the other employees in the branch and ...the only reason that she was selected to be laid off was because of the (sic) age."[6]

## VII.   Khan learns that her position will be eliminated and that she can apply for other jobs in the Regions system.

In October 2001, Wilkes and Lloyd visited the Talladega branch and notified several employees there, including Khan, that their positions were to be eliminated. (Khan Dep., 144, 17778). She and other Talladega employees whose jobs were to be eliminated were told that their jobs would be transferred to Birmingham or eliminated altogether. (Id., 145). Khan was offered the opportunity to apply for other open positions within Regions and was given a list of available positions. (Khan Dep., 29, 31). A position similar to hers was available in Gadsden, but Khan

---

[6] The complaint requested lost wages plus health insurance and other benefits, reinstatement, liquidated damages, attorneys' fees, expenses, and costs.

elected not to apply for it or for any of the other jobs listed. (*Id.* 29-30). Regions also offered outplacement assistance in finding a new job, if she elected not to pursue another position within the Regions system. (*Id.*, 147).

## VIII.   Khan elects to work with her husband rather than apply for any other Regions job.

Khan stated that she believed Janet Mitchell should have been transferred to a teller position so that Khan could be transferred to Mitchell's job as vault custodian. (Khan Dep., 148-49). In his deposition, Wood testified that he was not aware of any such desire by Khan and/or Mitchell. (Wood Dep., 39-40). Even if he had been, Wood asserted, he was not aware of any procedure allowing for such rollbacks. (*Id..*, 40.)

Instead of applying for another position with Regions, Khan went to work as the office manager for her husband's medical practice. (Khan Dep., 33.) Her husband, Dr. Khalid L. Khan, is an ophthalmologist. (*Id.*, 11). Khan's last day employed by Regions was December 31, 2003, and her first day working with her husband was January 2, 2004. (*Id.*, 33). She received a severance package from Regions in the amount of $17, 928. (*Id.*, 149).

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could not meet their

burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted). The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay*, 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS

I.   **Defendant's Motion**

    A.   **Plaintiff's sole cause of action is a claim of disparate treatment age discrimination.**

To prevail on an ADEA disparate treatment claim, defendant contends, plaintiff must prove that the defendant was motivated by the plaintiff's age in taking the alleged adverse employment action. *See Verbraeken v. Westinghouse Electric Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989) ("In a case brought pursuant to the ADEA, the plaintiff bears the ultimate burden of proving that age was

a determinative factor in the employer's decision to terminate his employment."). "[L]iability depends on whether the protected trait actually motivated the employer's decision." *Hazen Paper Co. v. Biggins*, 507 U.S. 604,610 (1993). To succeed on such a claim, Regions argues, Khan must prove that her age "actually played a role in [the employer's decision making process] and had a determinative influence on the outcome." *Id.* The plaintiff must prove, in other words, that if it were not for her age, the employer would not have taken the alleged adverse employment action. *See Farley v. National Mut. Ins. Co.*, 197 F.3d 1322, 1334-1335 (11th Cir. 1999).

**B.    The Proper Legal Framework**

According to defendant, Khan may meet her burden of proving disparate treatment motivated by age by either direct evidence that the employer discriminated against her on the basis of her age, "such as age-biased statements made by the decision maker," *see Zaben v. Air Prods. & Chems., Inc.*, 129 F.3d 1453, 1457 (11th Cir. 1997), or circumstantial evidence. ADEA cases employ the *McDonnell Douglas* burden-shifting framework applicable in Title VII discrimination cases. *See Williams v. Vitro Serv. Corp.*, 144 F.3d 1438, 1441 (11th Cir. 1998).

Under the *McDonnell Douglas* test, defendant asserts, plaintiff bears the initial burden of proving a prima facie case of age discrimination by a preponderance of the evidence. *See McDonnell Douglas*, 411 U.S. at 802-04. If she meets that burden, she establishes a rebuttable of presumption of discrimination. *Id.* In a reduction-in-force ("RIF") case like this one, Regions argues, the prima facie case is slightly modified, requiring plaintiff to prove "(1) that [s]he was in a protected age group and was adversely affected by an employment decision, (2) that [s]he was qualified for his current position or to assume another position at the time of discharge, and (3) evidence by which a fact finder reasonably could conclude that the employer intended to

15

discriminate on the basis of age in reaching that decision." *See Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207-08 (11th Cir. 1997).[7] Defendant relies on *Grigsby v. Reynolds Metals Company* for its contention that "the defendant's evidence of a legitimate, non-discriminatory reason for its actions may be so strong as to rebut completely the inference raised by the plaintiffs prima facie case." *See* 821 F.2d 590, 596 (11th Cir. 1987).

If the plaintiff meets her *prima facie* burden, Regions argues, the burden of production shifts to the defendant. A defendant may rebut the presumption, Regions notes, by articulating a legitimate, non-discriminatory reason for the alleged adverse employment action. *See Eskra v. Provident Life Accident Ins. Co.*, 125 F.3d 1406, 1411 (11th Cir. 1997). If the defendant satisfies that burden, plaintiff must then demonstrate pretext. *See McDonnell Douglas* at 802-04. According to defendant, plaintiff establishes pretext by establishing not only that the defendant's legitimate, non-discriminatory reason for its action was false but also that a reasonable fact finder could conclude that the true reason for its action was an intent to discriminate on the basis of the plaintiff's age. *See St. Mary's Honor Center v. Hicks*, 113 S.Ct. 2742, 2752 (1993); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184-85 (11th Cir. 1984). "It is not enough ... to disbelieve the employer; the fact finder must believe the plaintiff's explanation of intentional discrimination." *St. Mary's Honor Center* at 2754. Mere conclusory allegations and subjective beliefs of discrimination, defendant asserts, do not prove pretext. *See Earley*, 907 F.2d at 1081; *Young v. General Foods Corp.*, 840 F.2d 825, 830 (11th Cir. 1988), cert. denied, 488 U.S. 1004 (1989).

Defendant relies on *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 148

---

[7] Khan agrees with defendant that the *Benson* elements comprise her *prima facie* case.

(2000)(involving evidentiary burdens for judgment as a matter of law).[8]

---

[8] The court provides a more complete excerpt from *Reeves*:

Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. *See id.,* at 517, 113 S.Ct. 2742 ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination"). In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." *Wright v. West,* 505 U.S. 277, 296, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992); *see also Wilson v. United States,* 162 U.S. 613, 620- 621, 16 S.Ct. 895, 40 L.Ed. 1090 (1896); 2 J. Wigmore, Evidence § 278(2), p. 133 (J. Chadbourn rev. 1979). Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. *Cf. Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) ("[W]hen all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts with some reason, based his decision on an impermissible consideration"). Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact finder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. *See Aka v. Washington Hospital Center,* 156 F.3d, at 1291-1292; *see also Fisher v. Vassar College,* 114 F.3d, at 1338 ("[I]f the circumstances show that the defendant gave the false explanation to conceal something other than discrimination, the inference of discrimination will be weak or nonexistent"). To hold otherwise would be effectively to insulate an entire category of employment discrimination cases from review under Rule 50, and we have reiterated that trial courts should not " 'treat discrimination differently from other ultimate questions of fact.' " *St. Mary's Honor Center, supra,* at 524, 113 S.Ct. 2742 (*quoting Aikens,* 460 U.S., at 716, 103 S.Ct. 1478).

Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law. *See infra,* at 2110-2111. For purposes of this case, we need not--and could not--resolve all of the circumstances in which such factors would entitle an employer to judgment as a matter of law. It suffices to say that, because a prima facie case and sufficient evidence to reject the employer's explanation may permit a finding of liability, the Court of Appeals erred in proceeding from the premise that a plaintiff must always introduce additional, independent evidence of discrimination.

17

**B.     Plaintiff's sole claim fails as a matter of law.**

According to Regions, Khan has failed to establish either a *prima facie* case of age discrimination based upon the RIF or pretext.

### 1.     Plaintiff cannot establish a prima facie case.

Since Khan does not rely on direct evidence of discrimination, defendant argues, she must proceed under the burden-shifting framework of *McDonnell Douglas*. After reiterating the elements of a prima facie ADEA case involving an RIF, *see supra*, Regions contends that plaintiff has failed to prove the final element: evidence by which a fact finder reasonably could conclude that the employer intended to discriminate on the basis of age when it terminated her.

According to Regions, to establish a nexus between an employee's age and her inclusion in a group of employees to be laid off as part of a workforce reduction program, plaintiff must produce evidence demonstrating that the employer did not treat the age of the employee in question as a neutral factor. *See Williams v. General Motors Corp.*, 656 F.2d 120,129-20 (5th Cir. 1981). Such burden may be satisfied, defendant argues, by demonstrating that similarly situated, younger employees were retained when older employees in the same position and with similar qualifications were released. *See Taylor v. Canteen Corp.*, 69 F.3d 773 (7th Cir. 1995). An employer is under no obligation, defendant insists, to "allow one employee to bump a less senior, possibly younger employee, from a different position." *See Jones v. Unisys Corp.*, 54 F.3d 624, 630 (10th Cir. 1995); *see also Williams*, 656 F.2d at 130 ("The ADEA mandates that an employer reach employment decisions without regard to age, but it does not place an affirmative duty upon an employer to accord special treatment to members of the protected age group.") Moreover, defendant contends, plaintiff's burden may be met by showing that the employer refused to consider older employees for transfer

18

to other positions for which the employees were qualified. *See Jameson v. Arrow Co.*, 75 F.3d 1528, 1532-33 (11th Cir. 1996); *Taylor* at 773 (7th Cir. 1995) ("[A]n employer implementing an RIF may not favor younger employees over older ones by finding new positions only for younger workers.").

Minus circumstantial evidence of a nexus between age and the decision to eliminate the plaintiff's position, defendant concedes, a plaintiff in a RIF case may rely on statistics showing "proof of a pattern of discrimination." *See Pace v. Southern Ry. Sys.*, 701 F.2d 1383, 1388 (11th Cir. 1983). "If a plaintiff seeks to rely on proof of a pattern of discrimination to satisfy this pertinent element of a prima facie case, he has the burden of presenting such statistical evidence that will, in conjunction with the other elements, give rise to an inference of discrimination." *Id.*

By defendant's account, Khan has offered no evidence that Regions intended to discriminate on the basis of age when including her position in the RIF. Furthermore, Regions argues, Kahn has failed to show that any similarly situated, younger employees were retained or treated better than she was.[9]  Furthermore, defendant argues, plaintiff has produced no evidence that younger employees were allowed to bid on other available jobs while she was precluded from doing so. Finally, defendant contends, Khan has produced no statistical evidence indicating a pattern of discrimination.[10]

To the contrary, Regions contends, the only evidence in the record concerning Regions's decision-making process is the undisputed evidence that the committee established and followed a totally age-neutral process. According to defendant, Wood's testimony is undisputed that the only factor considered by him and the other committee members in determining what positions to

---

[9] Plaintiff argues that Janet Mitchell is a proper comparator. *See infra.*

[10] Plaintiff's statistical argument is described *infra.*

eliminate was whether the position in question had sufficient work to justify a full-time position. (Wood Dep., 19, 21, 29-30, 37).

Defendant highlights Khan's deposition testimony as follows:

Q.      You say, "I believe I was terminated because of my age."
A.      Right.
Q.      Why do you think that?
A.      Because I'm older and perhaps just an older person can't - you know, maybe they think they can't or can't keep up or whatever, you know. I mean, I just think that's what they did. They looked at my age and saw that I only had maybe five more years to work, so they just said out.
Q.      Do you have any evidence to support that, or is that just your subjective belief?
A.      Well, from everything that I - it doesn't make sense from everything that I have said, you know. This is my job description and they don't need me? But yet the job is still going on. So what else can I think?
Q.      Did anyone say anything to you that made you believe that it was a decision based on age, anyone with the bank, that is?
A.      No.

Regarding plaintiff's argument that Janet Mitchell is a proper comparator, Regions contends, the undisputed evidence indicates that Khan and Mitchell were not similarly situated. Following his interviews, Gary Wood concluded that the job functions Khan was performing simply did not justify a full-time employee while the job functions that Mitchell was performing did. (Wood Dep., 25.) Thus, Regions argues: "[A]s to the sole issue considered by the committee in determining what positions to eliminate and keep, Khan and Mitchell were not similarly situated." Furthermore, Regions points out, Khan was an officer of the bank, while Mitchell was not, and they had different job responsibilities. (Wood Depo., 25; Wood Decl., ¶10.)

Regions emphasizes Khan's statement that she thought Regions should have bumped Mitchell from her position as vault teller to a position as a teller and then allowed Khan to transfer to the vault teller position. (Khan Dep., 148-49.) According to Regions, Khan's statement embodies

a "tacit admission that the work she had been doing could be combined with the work being performed by the vault teller and that her former position could then be eliminated." As such, Regions argues, Khan has contradicted her assertion that her workload was sufficient for a full-time position. Regardless, Regions reiterates, the law imposes no obligation for an employer to "bump" or "roll back" employees in that manner, and Khan's membership in a protected class did not entitle her to such preferential treatment. *See supra.*

According to defendant, the record reveals that, regarding transfers to other available positions within the company, Regions did not treat Khan differently than younger employees whose positions were eliminated. Khan testified that she rejected Regions's offer to her to apply for other positions that were available, choosing instead to work as her husband's office manager two days after her employment with Regions came to an end. (Khan Depo., 33.)

There is no evidence, Regions argues, tending to show that Regions considered Khan's age in any way in deciding to eliminate her position. *See Edwards v. Wallace Community College*, 49 F.3d 1517, 1522 (11th Cir. 1995) (rejecting plaintiff's discrimination claims which were founded upon "pure speculation.")

### 2.  Regions determined to eliminate plaintiff's position based on legitimate, nondiscriminatory factors.

Even assuming that Khan could prove a *prima facie* case, defendant asserts, Regions has produced evidence that its decision to eliminate her position was based on nondiscriminatory factors, i.e., Wood's belief that Khan's job responsibilities did not warrant a full-time position. Several duties listed on Khan's job description form and discussed with their interview, Wood asserted, had been automated or centralized and should no longer have been performed in the local branch, including: making manual notations about teller outages, proof errors, and daily transcounts (which

21

were maintained on Regions' centralized computer system and published in a monthly report); researching teller and customer outages (which had been centralized in Birmingham and no longer needed to be conducted at the local level); managing downloads to computers (which had been automated); and teller training (given that tellers were trained offsite and then assigned a fellow teller as a "coach."). The remainder of Khan's listed duties, Wood believed, required "just a few minutes each day" to complete. (Wood Depo., 26).

Wood denied basing his recommendation of termination on Khan's age. (Wood Depo., at 52). Instead, Wood asserted, the decision was based on his conclusion that she did not have sufficient work to justify a full-time position and his belief that she had "quite a few hours a day [where] there would not be anything going on." (Wood Depo., 26). According to Regions, Wood's rationale is age-neutral, thereby meeting defendant's burden of articulating a legitimate, non-discriminatory reason for Khan's termination.

### 3.   Plaintiff offers no evidence of pretext.

According to defendant, Khan must provide sufficient evidence for a reasonable fact finder to conclude that Regions' reason for the decision was "false and that the real reason was" age discrimination. *See Sullivan v. Amtrack*, 170 F.3d 1056, 1061 (11th Cir. 1999), cert. denied, 528 U.S. 1107 (2000). Regions also relies on *Chapman v. Al Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000)(en banc): "A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason."

Regions concludes:

> The evidence concerning the decision-making process engaged in by the team leading the staff adequacy review, and in particular Gary Wood and Steve Wilkes, is clear and undisputed. They identified a position that did not have sufficient work to justify a full-time employee and concluded it should be eliminated. Khan herself implicitly acceded to that logic in suggesting that she be moved to Janet Mitchell's job and that Janet Mitchell be demoted to teller. More basically, however, she has offered no evidence whatsoever that would allow a reasonable fact finder to conclude that Regions' articulated reason was a mere pretext for an intent to discriminate on the basis of her age.

## II.    Plaintiff's Response

In this case, Kahn asserts, a sixty-year-old person plus five other persons in her branch were laid off in a RIF. At the time of the layoff, plaintiff argues, defendant had thirty-four employees below the level of branch manager[11] in its organization and twenty-six of those (76%) were under fifty while eight of those (24%) were over fifty. Of the six employees laid off at the Talladega branch, Kahn alleges, five (83%) were over fifty,[12] while one (17%) was under fifty. Accordingly, Kahn argues: "[W]hile persons over fifty made up only 24% of the work force they made up five of the six or 83% of the persons laid off and were laid off at a rate five times that of persons under fifty."[13]

According to plaintiff, she meets the first *Benson* requirement, i.e., that she was in the protected age group and was adversely affected by her termination on December 31, 2002. Next, plaintiff argues, she meets the second requirement, i.e., that she was qualified for her current

---

[11] Wood did not include branch managers or above as candidates for termination.

[12] However, this court notes, it appears only <u>four</u> employees chosen for lay off were over fifty. *See infra.*

[13] For defendant's rebuttal of this statistical evidence, *see infra.*

position or to assume another position at the time of discharge.  In support of the second element,

plaintiff references her promotion in the months before her termination, the fact that she and

Mitchell (who was retained) performed each other's job duties when the other was out of the office,

her thirty-four years with the bank, and her rating of "exceeds expectations" on her reviews.

Contrary to defendant's assertion, Kahn contends, she also meets the third element, i.e.,

evidence that the decision-maker intended to discriminate on the basis of age in terminating her.

Kahn criticizes plaintiff's reliance on *St. Mary's Honor Center v. Hicks* as follows:

> Defendant simply contends through a long since disregarded
> interpretation of St. Mary's Honor Center v. Hick's that "pretext plus"
> is the law in this circuit and that therefore plaintiff cannot prove
> the last element of her prima facie case.  "Pretext plus," however, is
> not the law of this jurisdiction and plaintiff can prove the third element
> and pretext based upon the ages of the employees in the selection pool
> as compared to the ages of the persons terminated.  *See Combs v.
> Meadowcraft*, 106 F.3d 1519 (11th Cir. 1997).[14]

---

[14] Due to plaintiff's reliance *Combs* (which did not appear to involve any statistical evidence), this court
provides an excerpt:

> Based on the Supreme Court's clear statement in the majority opinion in *Hicks*, read
> together with the rationale of the dissenting justices, we understand the *Hicks* court to have been
> unanimous that disbelief of the defendant's proffered reasons, together with the plaintiff's prima
> facie case, is sufficient circumstantial evidence to support a finding of discrimination.  Therefore,
> it follows from *Hicks* that a plaintiff is entitled to survive summary judgment, and judgment as a
> matter of law, if there is sufficient evidence to demonstrate the existence of a genuine issue of fact
> as to the truth of each of the employer's proffered reasons for its challenged action.  With one
> exception, which we will discuss later, up until the *Isenbergh* opinion, not only the holdings but
> also the statements of this Court have been entirely consistent with that understanding of the *Hicks*
> decision.
>
> ....
>
> When deciding a motion by the defendant for judgment as a matter of law in a
> discrimination case in which the defendant has proffered nondiscriminatory reasons for its actions,
> the district court's task is a highly focused one.  The district court must, in view of all the evidence,
> determine whether the plaintiff has cast sufficient doubt on the defendant's proffered
> nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's
> proffered "legitimate reasons were not what actually motivated its conduct," *Cooper-Houston v.
> Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir.1994) (citation omitted).  The district court must
> evaluate whether the plaintiff has demonstrated "such weaknesses, implausibilities,

In the instant case, plaintiff argues, the numbers and statistical disparity, i.e., "persons over fifty years of age making up one fourth of the work force but being laid off at a rate five times that of those under fifty," are enough to lead a reasonable factfinder to conclude that age was the motivating factor behind Regions's decision to terminate her. Additionally, Kahn argues, Wood conceded that he knew that most of the employees whom he interviewed were over forty. Here, plaintiff argues, the statistical evidence, *see supra*, clearly demonstrates age bias.

## III.    Defendant's Reply[15]

First, defendant argues, Khan's statistical evidence is based on either a mischaracterization or misunderstanding of the disputed evidence and thus fails to constitute "evidence by which a fact finder reasonably could conclude that the employer intended to discriminate on the basis of age in reaching [its] decision." *See Watkins v. Sverdrup Tech., Inc.*, 153 F.3d 1308, 1314 (11th Cir. 1998).

According to Regions, statistical evidence is subject to close scrutiny to determine if it is sufficiently probative. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339-340 (1977)("statistics are not irrefutable ... [,and] their usefulness depends on all of the surrounding facts and circumstances"). Arguments based on a plaintiff's subjective interpretation of an employer's records, Regions argues, do not create an actionable inference of age discrimination. *See Hopper*

---

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Sheridan*, 100 F.3d at 1072 (citation and internal quotation marks omitted); *see also Walker*, 53 F.3d at 1564 (Johnson, J., concurring) (discussing methods of proving pretext). However, once the district court determines that a reasonable jury could conclude that the employer's proffered reasons were not the real reason for its decision, the court may not preempt the jury's role of determining whether to draw an inference of intentional discrimination from the plaintiff's prima facie case taken together with rejection of the employer's explanations for its action. At that point, judgment as a matter of law is unavailable.

[15] Defendant criticizes plaintiff for allegedly failing to follow the court's summary judgment submission order.

*v. Hallmark Cards, Inc.*, 87 F.3d 983, 989 (8th Cir. 1996).[16]  Instead, Regions contends, statistical

arguments should be supported by expert testimony.  *See Vaughan v. MetraHealth Cos.*, 145 F.3d

197, 203-04 (4th Cir. 1998), *abrogated on other grounds, Van Slyke v. Northrop Grunman Corp.*,

---

[16] The court quotes *Hopper* at the cited page:

On these facts, Hopper failed to adequately rebut Hallmark's proffered reasons for discharging him and, therefore, failed to demonstrate that Hallmark had a discriminatory reason for firing him. Although some of the evidence presented showed an effort to discharge him, Hopper failed to show that the reason for that effort was his age. At best, Hopper's allegations were evidence of: (1) an antagonistic relationship with his immediate supervisor; (2) a high rate of missed work which aggravated Hopper's work relationships; and (3) substance abuse and corresponding legal difficulties which caused Hopper to miss more work.

Hopper presented statistical evidence to show that all managerial-level employees discharged within the eighteen-month period surrounding his discharge were over the age of forty. Few of those discharged were members of Hopper's work unit; many were employed at different plants, in different states. These statistics showed that managers over the age of forty were more likely to be discharged than those under forty, but failed to show that those discharged were similarly situated, qualified individuals who were singled out for adverse employment decisions based on their age. Hopper admitted that the statistics were based on his own subjective interpretation of Hallmark's records and excluded other younger managers who had been discharged from various departments just prior to the date the data covered. Furthermore, Hopper conceded that of all those employees over the age of forty under Bisel's supervision, he was the only one discharged despite being the youngest of those in the over-forty age group. The statistical evidence, therefore, did not raise a reasonable inference of age discrimination. Any other conclusion would require that we resort to speculation on Hopper's behalf, a tool unavailable to us on review of this judgment as a matter of law.

Assuming Hopper was not in contravention of company policy against excess absences, Hopper himself conceded that he believed his absentee rate was unsatisfactory at times. This concession is particularly relevant considering Hopper's supervisory position over other employees for whom he was expected to set an example. The evidence also showed that Hopper had been apprised of his unsatisfactory rating, was urged to improve upon it, but failed to do so.

Hopper's job performance evaluations and pay raise evidence account for the remainder of his circumstantial evidence. This evidence did little more than show satisfactory work performance, an element of the prima facie case of age discrimination which we have already assumed was established for purposes of this appeal. Although evidence of good performance can serve as evidence of pretext when an employee is discharged for poor performance, see, e.g., Hutson, 63 F.3d at 779, standing alone, it was insufficient to do so here.

The only reasonable inference to be drawn from these facts is that Hopper was fired because of his poor performance and attendance. Therefore, Hopper failed to rebut Hallmark's proffered reasons for his discharge. Hicks, 509 U.S. at 506-10, 113 S.Ct. at 2747-48 (pretextual reason must be a pretext for age discrimination, or plaintiff has not carried burden of showing age discrimination). Because Hopper failed to offer sufficient evidence from which a jury could reasonably infer that he was fired because of his age, the district court correctly disposed of this claim on motion for judgment as a matter of law.

115 F. Supp. 2d 587 (D. Md. 2000).

According to Regions, statistical evidence must meet some general requirements, including: (1) a sufficiently large sample size to be meaningful;[17] (2) a statistically significant disparity between the treatment of employees in the protected class and those not in the protected class;[18] and (3) a sample consisting of employees who are similarly situated to the plaintiff.[19]

In the instant case, Regions asserts, Khan's proffered statistical analysis (by a layperson rather than an expert) was based on a facially incorrect application of the undisputed evidence. While Khan argues that five of the six employees laid off were over fifty, Regions contends, the evidence does not support her argument.  Khan cites defendant's responses to discovery requests, in which Regions listed the six laid off individuals and a table showing their ages, along with the ages of other employees of defendant's Talladega affiliate bank, which includes locations in Lincoln and Sylacauga.  The cited evidence, Regions observes, indicates that two of the six employees, i.e., Tawana McWilliams and Shonda Strickland, were in their thirties.

Moreover, defendant contends, plaintiff has misconstrued the universe of employees who were subject to potential job elimination through the RIF.  While she characterizes the eligible employees as those of defendant's Talladega affiliate bank who ranked below branch manager (citing to page 38 of Wood's deposition), Regions argues, Wood stated that positions to be reviewed

---

[17] *See Int'l Bhd of Teamsters* at n. 20 ("Considerations such as small sample size may, of course, detract from the value of such evidence[.]"); *Harper v. TransWorld Airlines, Inc.*, 525 F.2d 409, 412 (8th Cir. 1975)("[S]tatistical evidence derived from an extremely small universe ... has little predictive value and must be disregarded.")

[18] *See Schultz v. McDonnell Douglas Corp.*, 105 F.3d 1258, 1259-60 (8th Cir. 1997)("The probative value of statistical evidence that does not reflect significant differences among employers would be prejudicial and misleading."); *EEOC v. McDonnell Douglas Corp.*, 17 F. Supp. 2d 1048, 1053-54 (E.D. Mo. 1998)(finding statistics not significant where RIF decreased the percentage of employees over 55 in the workforce from 14.7% to 13.5%).

[19] *See Watkins, supra.*

were listed on his notes (Exhibit 8 to his deposition) and excluded both branch managers and tellers.[20]

Thus, Regions argues, Khan mischaracterized the sample because her statistical universe appears to include tellers. Even if she had correctly identified the right employees subject to lay off, Regions further argues, her layperson's conclusory analysis is inadequate. According to Regions, Khan's statistics are meaningless numbers that do not survive careful scrutiny.

A basic analysis of the evidence, Regions asserts, undercuts Khan's argument. Based on the ages of the persons identified in Wood's Exhibit 8, Regions argues:

> The number of people in the universe of possible reductions whose ages placed them in the protected class (over 40) was 76.9% of the total group. Of the total group, six positions were eliminated. Of those six positions, only four, or 66.6%, were occupied by persons in the protected class. Furthermore, the percentage of employees in the universe who were over 40 jumped from 76.9% before the reduction to 85.7% after the reduction. Thus, contrary to the Plaintiff's unfounded assertions, a statistical analysis of the RIF's results offers no assistance whatsoever to Plaintiff's attempt to prove the causal nexus between age and the layoff decision.

Finally, Regions reiterates, plaintiff has failed to show pretext. According to Regions, the

---

[20] Regions provides the following excerpt from Wood's deposition:

Q: Okay. What is Exhibit 8?
A: That is the list that I made up of people that we were going to look at, interview.
Q: Is that basically all the employees below branch manager in the area?
A: In the organizational chart these people wouldn't necessarily be reporting to a branch manager so the term below is not appropriate.
Q: Well, okay. I guess what I was asking was were you eliminating any branch managers?
A: No.
Q: So were there any branch managers on the list?
A: No.
Q: Were there other categories of people that you were not eliminating besides branch manager?
A: Yes.
Q: What other categories?
A: We didn't eliminate tellers.
Q: No branch managers, no tellers?
A: Right.

decision maker, Wood,[21] selected Khan's position to be included in the workforce reduction because he believed that many of the job functions she listed would take "just a few minutes each day" to complete, that she would have had "quite a few hours a day [where] there would not be anything going on," and that she did not have sufficient responsibilities to occupy a full-time employee. Here, defendant argues, Khan has made no attempt to meet and rebut this rationale.

**CONCLUSIONS OF THE COURT**

The factors which this court should consider include the "strength of the plaintiff's prima facie case, the probative value of the proof that the employer's evidence is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for [summary judgment]." *See Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 148-49 (2000). The *Reeves* court further stated: "[T]he standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" (citation omitted). *Id.* at 150. Here, all these factors weigh in defendant's favor.

The court having fully considered the evidence concludes that there is no reasonable inference that plaintiff's termination came as a result of her age being a factor. Even assuming that plaintiff has proved a prima facie case, the defendant has articulated that its decision to abolish her job came as a result of a reasoned consideration of the need for the job. In rebuttal the plaintiff simply offers her age and some evidentially insignificant statistics.[22] Perhaps plaintiff's termination came as the result of an overemphasis on centralization, profits,

---

[21] The court notes that while Wood was the team leader and recommended Khan's termination, it appears that he was working in the context of a committee and presented that recommendation to both other committee members and the bank president before acting on it. *See* Wood Dep., pages 36-41.

[22] Insignificant even if accurate.

29

efficiency, etc.  There is no reasonable inference that her age was a factor.  The defendant's

motion will be granted.

     This the _____ day of August, 2004.


ROBERT B. PROPST
**SENIOR UNITED STATES DISTRICT JUDGE**

30